UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| RAYMOND DEAN BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-00240-JPH-MJD |
| | ) | |
| WILLIAM E. WILSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Interested Party. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Raymond Dean Brown, a federal inmate confined at the Federal
Correctional Center in Terre Haute, Indiana ("FCC Terre Haute"), brings this
action against the defendants, Dr. Elizabeth Trueblood, Dr. William E. Wilson,
and Dr. David Lukens, alleging that they were deliberately indifferent to his
serious medical conditions in violation of his Eighth Amendment rights.  Dkt.
54.  He seeks damages pursuant to *Bivens v. Six Unknown Narcotics Agents*,
403 U.S. 388 (1971), and injunctive relief.  *Id.*

Defendants Dr. Trueblood, Dr. William Wilson, and Dr. David Lukens
filed motions for summary judgment.  Dkts. 240, 242, 244.  Shortly thereafter,
Mr. Brown voluntarily dismissed his claims against Dr. Trueblood.  Dkt. 252.
Accordingly, Dr. Trueblood's motion for summary judgment, dkt. [240], is
**DENIED AS MOOT.**

Defendant Dr. Lukens argues that he is entitled to summary judgment because this case creates a new context under *Bivens*, that he was not deliberately indifferent, and that he is entitled to qualified immunity.  Dkt. 242. Defendant Dr. Wilson echoes Dr. Lukens' arguments and also contends that he is entitled to summary judgment because he was not personally involved in Mr. Brown's ophthalmological care and he was not Mr. Brown's treating physician for cardiac care.  Dkt. 244.

For the reasons that follow, the defendants' partial motion to strike expert testimony, dkt. [256], is **DENIED**; the defendants' motions for summary judgment, dkts. [242], [244], are **GRANTED;** and defendants' partial motion to exclude expert testimony, dkt. [248], is **DENIED AS MOOT**.

## I.
## Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party.  *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it

need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Brown and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

Mr. Brown is a 63-year-old inmate housed at the FCC Terre Haute Federal Prison, a part of the Federal Bureau of Prisons. Dkt. 242-20 at 10-11.

Dr. William E. Wilson is a medical doctor who is employed by the Federal Bureau of Prisons at FCC Terre Haute as the Clinical Director. Dkt. 244-1 at

1. As the Clinical Director, Dr. Wilson oversees the clinical operations of the Health Services Department of FCC Terre Haute. *Id.*

Dr. David Lukens is also employed by the Federal Bureau of Prisons at FCC Terre Haute as a medical doctor. Dkt. 242-1 at 1. As a medical doctor, Dr. Lukens ensures that the medical treatment of all inmates is in conformity with the appropriate standards of care and consistent with BOP policy. *Id.*

**B. Mr. Brown's Serious Medical Conditions**

Mr. Brown has a complex medical history of "diabetes, a prior stroke, allergies, GI bleeding with sepsis, benign prostatic, hyperplasia, atrial fibrillation, congestive heart failure, hypertension, and hyperthyroidism." Dkt. 254 at 3; dkt. 242-1 at 2.

He believes the stroke that occurred in 2015 was caused by embolism/atrial fibrillation. Dkt. 253-2 at 2. Atrial fibrillation is an irregularity in a patient's heartbeat that frequently causes blood clotting and strokes due to stagnant blood. Dkt. 253-1 at 3.

In 2016, Mr. Brown was transferred to FCC Terre Haute, primarily to be "considered . . . for [an] ablative procedure" to treat atrial fibrillation. Dkt. 253-2 at 2. After his arrival at FCC Terre Haute, Mr. Brown began anti-coagulant therapy to prevent blood clots that could eventually lead to another stroke. Dkt. 253-4 at 2. These therapy appointments were co-signed by both Dr. Wilson and Dr. Lukens at various times. Dkts. 253-4 at 4, 253-5 at 4. Mr. Brown was prescribed the anti-coagulant Antixapan, which is also known as Eliquis. Dkt. 242-15 at 1. Mr. Brown's Eliquis was dispensed as "self-

4

carry," meaning that Mr. Brown kept the medication on his person and managed it himself.  Dkt. 242-14 at 2.

### C. Mr. Brown's 2017 Ablation Surgery and Follow-up Care

On September 19, 2017, Mr. Brown underwent an ablation surgery. Dkt. 253-6 at 2.  Cardiac ablation uses heat or cold energy to create tiny scars in the heart to block irregular electrical signals and restore a typical heartbeat. Dkt 244-1 at 3.  This procedure is used to correct heart rhythm problems such as arrythmias.  *Id.*  After the procedure, Mr. Brown reported that he was not having as many heart palpations as he had before the procedure, and he reported no chest pain, shortness of breath or dizziness.  Dkt. 244-2 at 1.

After this ablation surgery, Mr. Brown received care from a team of cardiologists including Dr. Thomas Orman, two electrophysiologists, Dr. Ashok Koul and Dr. John Miller, and other outside cardiac practitioners as needed, in addition to and supervised by Dr. Wilson.  Dkt. 244-1 at 6.  In December of 2018, Mr. Brown saw Dr. Orman for a routine visit when he reported that his heart was skipping.  244-2 at 3.  Dr. Orman ordered an EKG for Mr. Brown which was reviewed and workshopped with Dr. Wilson.  Dkt. 244-4 at 1.  Dr. Wilson notated in his clinical records:

> The cardiologist I spoke with questioned the need for Cordarone but did suggest a 24-hour Holter monitor, follow up with cardiology in house, maintain anticoagulation.  Further consideration can be given to stopping the Cordarone because the cardiologist I spoke with did not feel like it was doing any thing for rate control. . . . The patient already had an electrophysiology cardiac appointment requested.  I will ask scheduling that this appointment be moved up.

*Id.*

Mr. Brown was provided a Holter monitor shortly thereafter. *Id.* In February of 2019, he continued to receive care from an electrophysiologist and nurse who noted that Mr. Brown's atrial fibrillation continued. Dkt. 244-5 at 1. The nurse recommended further evaluation and treatment of Mr. Brown's heart condition which was co-signed by Dr. Wilson. *Id.* at 2.

### D. Mr. Brown's Diminishing Eyesight and Continued Heart Condition

On February 15, 2019, Mr. Brown was seen by an optometrist, Dr. Donald Auxier, after experiencing two episodes of "foggy" and "blurry" vision. Dkt. 253-8 at 2. Mr. Brown reported that he had not experienced pain, headache, or dizziness in connection with the episodes. *Id.* Dr. Auxier noted "probable transient ischemic attach/occular migraine . . . if it repeats PCP should rule out stroke/diabetes." *Id.* at 3. Mr. Brown had cataracts in both eyes. *Id.* Dr. Wilson co-signed this visit note. *Id.*

On February 26, 2019, Mr. Brown reported decreased vision to Nurse Practitioner Klink. Dkt. 253-11 at 2–5. Mr. Brown stated that although the deterioration began in December of 2018, his vision was starting to improve and mentioned potentially needing different glasses. *Id.* Nurse Klink notated "Denies any other problems. Denies any headaches or any other neurological symptoms. Denies any weakness numbness or tingling." *Id* at 2. She then recommended a visit with ophthalmology because "neurological exam completely normal at this time." *Id.* at 4.

On April 1, 2019, Mr. Brown met with Dr. Orman for a follow-up cardiac visit. Dkt. 244-6 at 1. During the visit, Mr. Brown reported that he had

reduced energy, shortness of breath with exertion, and continued palpitations. *Id.* Dr. Orman recommended that Mr. Brown schedule a follow up with Dr. Koul, Mr. Brown's electrophysiologist, about ablation. *Id.* at 2.

During this time, Mr. Brown was also seen again by Dr. Auxier, his optometrist, for a diagnosis of age-related cataracts. Dkt. 244-1 at 8. During a visit, Dr. Auxier reported in his clinical notes that Mr. Brown experienced a "sudden loss of vision os. Seems like a spot in front of line of sight; no pain; peripheral vision seems normal." Dkt. 242-2 at 1. Although Dr. Auxier initially requested a co-sign from Dr. Wilson, his note was co-signed by another doctor, Dr. Paul Harvey. *Id.* at 3. Dr. Auxier referred Mr. Brown to an outside ophthalmologist. *Id.* at 1.

On April 9, 2019, Mr. Brown saw Dr. Chirag Patel, an outside ophthalmologist. Dkt. 242-3 at 1. Mr. Brown reported that he had an episode in December where vision was blurry for 3-5 days, then returned to normal, and another episode of blurry vision again in April but had returned to normal. *Id.* On that day, Dr. Patel wrote that Mr. Brown's symptoms were "not consistent with typical cataract[s]" but still planned a follow-up appointment for cataract surgery. *Id.* at 3. At a later visit in June, Dr. Patel wrote that Mr. Brown "wishes to have surgery, OD, to try to improve his vision so that he may see better to do what he needs to do. The patient was informed of the potential benefits as well as the risks of surgery and the pros and cons of alternative forms of care." Dkt. 242-2 at 1.

**E. Mr. Brown's July 2019 Cataract Surgery**

7

Prior to Mr. Brown's surgery, Dr. Patel's pre-operative instructions were emailed to an employee of NaphCare, the third-party contractor who handles administrative tasks for the Health Services Department.  Dkts. 242-1 at 3; 242-6.  The instructions were then reviewed by Nurse Trisha Haddix, who entered them into Mr. Brown's medical chart for Dr. Lukens' review and signature.  *Id.*  The instructions read "10 days prior: hold all OTC blood thinners.  5 days prior: hold all prescription blood thinners."  Dkt. 242-6 at 8.  Dr. Lukens reviewed and co-signed the preoperative instructions ordered by Dr. Patel.  Dkt. 242-1 at 3.

Dr. Lefkowitz, an expert retained by the defendants, testified in his in deposition that co-signing an order "mean[s] you've reviewed and approve of the order that you're co-signing," and "represent[ed] an endorsement of the preoperative order."  Dkt. 253-13 at 36.

Dr. Lukens testified that it is common for surgeons or surgery centers to issue instructions to hold anticoagulation medication before surgery.  Dkt. 242-1 at 5.  Additionally, he testified that for decisions regarding the management of anti-coagulation medication before surgery, he relied on the recommendations of the surgeon performing the operation on the patient, which in this case was Dr. Patel.  *Id.*  Dr. Lukens followed Dr. Patel's instructions to stop the anti-coagulant medication before surgery because he concluded that it was appropriate, and the order was not excessive.  *Id.*

On July 1, 2019, Dr. Patel performed cataract surgery on Mr. Brown's right eye with lens implantation at the Wabash Valley Surgery Center.  Dkt.

8

242-5.  In his operative report, Dr. Patel affirmed that there were no complications, and Mr. Brown tolerated the procedure well.  *Id.* at 2.  Dr. Patel provided discharge instructions to the prison which included Mr. Brown resuming his previous medications, including his Eliquis.  Dkt. 242-8 at 1-2.

### F. Post-Surgery Vision Loss

On July 2, 2019, Mr. Brown was examined by Dr. Patel for a post-operative follow-up.  Dkt 242-9 at 1.  Dr. Patel reported that Mr. Brown was "doing pretty good. No pain, no headache."  *Id.*  He was seen the same day by a nurse when he returned to FCC Terre Haute, and the nurse reported that Mr. Brown had no complaints or concerns.  Dkt. 242-10.

Mr. Brown was also seen on July 8 and July 9—once by Dr. Lukens and once by Dr. Patel.  Dkts. 242-11, 242-12.  At both visits, Mr. Brown reported no distress and expressed that he was pleased with the results of the surgery and increase in vision.  Dkts. 242-11 at 1, 242-12 at 1.

On July 10, 2019, Mr. Brown saw a nurse and reported that he was experiencing peripheral vision loss.  Dkt. 253-16 at 2.  He told the nurse that the issue had started last week when he was being prepped for surgery, and although he reported it to Dr. Patel before the operation, he was now again experiencing an increased loss of his vision.  *Id.*  Mr. Brown then had another follow-up with Dr. Patel, who cancelled the previously scheduled second cataract surgery and referred Mr. Brown to a neurologist after learning of his worsening symptoms.  Dkt. 242-16.

Dr. Lukens met with Mr. Brown on July 12, 2019, and after learning of his vision loss, Dr. Lukens immediately ordered that Mr. Brown be taken to an emergency room at an area hospital.  Dkt. 242-17.  At the emergency room on the same day, Mr. Brown was diagnosed with a stroke-induced left homonymous hemianopsia that resulted in a permanent loss of his vision. Dkt. 253-17 at 2.

### G. Second Ablation Surgery

Although Mr. Brown had been scheduled for a second ablation surgery in July of 2019, the procedure was cancelled after his stroke was discovered. Dkt. 244-1 at 8.  Mr. Brown was notified of the cancellation by a nurse a week later.  Dkt. 244-9.

On July 16, 2019, Dr. Koul saw Mr. Brown at the hospital after his stroke and noted that he "continues to have episodes of atrial fibrillation although they are better tolerated and rate controlled."  Dkt. 244-8 at 2.  Mr. Brown expressed to Dr. Koul that he still wanted to proceed with a second ablation procedure, but Dr. Koul informed him that he was leaving the practice so he would be referred to another practitioner for additional care.  *Id.*

Mr. Brown eventually saw another practitioner on October 19, when he met with Dr. Simon under the supervision of Dr. Miller.  Dkt. 244-11.  Dr. Simon agreed that they should proceed with a second ablation procedure and notated to schedule Mr. Brown for the operation in the coming months.  *Id.*

On February 4, 2020, Mr. Brown underwent the second ablation surgery with Dr. Miller.  Dkt. 244-15.  Mr. Brown states that the surgery eliminated the

majority of his atrial fibrillation episodes, and he no longer takes medication for heartbeat rhythm regulation.  Dkt. 242-20 at 6.

### H. Mr. Brown's Claims

Mr. Brown brings two central claims against the defendants: first, that the pre-operative stoppage of his blood thinners before cataract surgery was "unnecessary and extensive" and contributed to his stroke; and second, that there had been "collective delays" in scheduling his ablation surgery which contributed to his stroke.  Dkts. 242-18; 242-19.  Mr. Brown alleges that Dr. Wilson should have intervened and made sure that he received a second ablation procedure sooner.  Dkt. 244-16 at 78.  Further, he alleges that Dr. Lukens should have overridden Dr. Patel's instructions to stop his anti-coagulants prior to cataract surgery.  Dkt. 242-20 at 77.

### I. Expert Witness Opinions

Mr. Brown's expert witness, Dr. Charles Howard, testified that Mr. Brown's February 15, 2019, optometrist visit that indicated he had potentially suffered a stroke "should have immediately resulted in a hospital trip because these complaints had already occurred several times.  Mr. Brown clearly was experiencing clots thrown from his atrial fibrillation."  Dkt. 248-1 at 8.  Dr. Howard further testified that "bells, whistles, and sirens should have been going off" when Dr. Wilson read Dr. Auxier's report indicating that Mr. Brown possibly had a stroke.  Dkt. 253-10 at 32.  Based on that report, Dr. Wilson

should have sent Mr. Brown to the emergency room immediately.  Dkt. 253-10 at 32.

Dr. Lefkowitz, the defendants' expert witness, testified that the standard of care for the time an ophthalmologist would typically withhold anti-coagulants prior to surgery is three days.  Dkt. 253-31 at 24-25.  However, Dr. Lefkowitz agreed that Dr. Patel's preoperative order was within the applicable standard of care.  Dkt. 242-23 at 6.

Another expert for Defendants, Dr. Sutton, testified that most cataract surgeons "do not routinely withhold blood thinners prior to cataract surgery," but he agreed that "some still do."  Dkt. 253-12 at 70.  Dr. Sutton testified that the order to withhold anti-coagulants for five days was most likely standard instructions from the surgery center that may not have been tailored to Mr. Brown's needs.  Dkt. 253-12 at 71-72.  However, Dr. Sutton opined that BOP staff acted reasonably in following the pre-operative order to discontinue anti-coagulants.  Dkt. 242-21 at 2.

Dr. Howard opined that Dr. Lukens' decision to co-sign the pre-operative instruction without further consultation fell below the standard of care.  Dkt. 248-1 at 9.

### III.
### Analysis

#### A. *Bivens* claim

As a threshold matter, the Court must address whether Mr. Brown's claims present a new *Bivens* context.  Doctor Lukens and Dr. Wilson argue that Mr. Brown is not entitled to relief because his Eighth Amendment deliberate

indifference to medical care claims present a new *Bivens* context, and "special factors" counsel against expanding *Bivens* to those claims.  Dkt. 257 at 7-10; dkt. 258 at 8-17.  Mr. Brown responds that his claims against Dr. Wilson and Dr. Lukens do not diverge in a meaningful way from previous *Bivens* cases.  Dkt. 254 at 24-29.

The *Bivens* doctrine is a judicially created cause of action against federal officials for certain alleged Constitutional violations.  *Brooks v. Richardson*, 131 F.4th 613 (7th Cir. 2025).  The Supreme Court first recognized this implied cause of action for an alleged violation of the Fourth Amendment during an arrest in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).  The Supreme Court later twice extended the implied cause of action against federal officials.  First, in *Davis v. Passman* 442 U.S. 228 (1979), the Court recognized a cause of action for under the Fifth Amendment for a gender discrimination claim by a former congressional staffer.  Second, in *Carlson v. Green*, 446 U.S. 14 (1980), the Court recognized a cause of action for an Eighth Amendment claim by a prisoner who asserted he received constitutionally inadequate medical care.

Since *Carlson*, the Supreme Court has declined to extend a *Bivens* remedy to any other contexts.  *Ziglar v. Abassi*, 582 U.S. 120, 131 ("three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself.").  The creation of new *Bivens* actions is "a disfavored judicial activity," because an extension is "an extraordinary act that places great stress on the

separation of powers." *Egbert v. Boule*, 596 U.S. 482, 491 (2022).  Thus, trial courts are to assess a *Bivens* claim using a two-step inquiry to ensure they fall within an already-created *Bivens* context.  *Id.* at 492.

First, a court asks whether such claim presents "a new *Bivens* context," that is, a claim that is "'meaningful[ly]' different from the three cases in which the Court has implied a damages action." *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 139).  A difference is meaningful if it "involves a factual distinction or new legal issue that might alter the policy balance that initially justified the implied damages remedies in the *Bivens* trilogy." *Brooks*, 131 F.4th at 616 (quoting *Snowden v. Henning*, 72 F.4th 237, 239 (7th Cir. 2023).  Meaningful differences may include, but are not limited to:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar*, 582 U.S. at 122.

If the case does not present a new context, it may proceed under *Bivens*. However, if the case presents a new *Bivens* context, the Court then inquires whether there are "special factors counseling hesitation before authorizing a new kind of federal litigation." *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020). Because of the potential intrusion on the legislative branch, "if there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may

not recognize a *Bivens* remedy." *Egbert,* 596 U.S. at 192 (2022) (quoting *Hernandez*, 589 U.S. at 102 (2020).

Using this framework, the Supreme Court has declined in every instance to extend *Bivens* remedies, including to other Eighth Amendment claims. *Godly v. Fields*, 606 U.S. 942 (2025) (declining to extend *Bivens* scope to include excessive force claims); *Minneci v. Pollard*, 565 U.S. 118 (2012) (declining to extend *Bivens* remedy against privately contracted prison employees); *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001) (declining to extend implied right of action against private prison entities). Thus, for Mr. Brown's *Bivens* claim to go forward, his claim must arise under an existing-*Bivens* context, in this case, the *Carlson*-context.

Defendants Dr. Wilson and Dr. Luken argue that the claims here present a new *Bivens* context because unlike in *Carlson*, they "did not (1) 'give contra-indicated drugs,' (2) knowingly keep him in a medical facility that was 'grossly inadequate,' or (3) prescribe a medical instrument known to be ineffective." Dkt. 257 at 8-10; dkt. 258 9-10. They further argue that the claims here are a

new context because the claims in *Carlson* included alleged racial animus[1], and the plaintiff was the mother of the deceased individual.[2]

In *Carlson*, the mother of the deceased brought suit alleging the defendants provided medically inadequate care for an asthmatic attack in which doctors failed to treat the patient for eight hours during the emergency, distributed contra-inducing drugs, and used defective medical equipment. *Carlson*, 446 U.S. at n.1. The Seventh Circuit recently recognized in *Watkins v. Mohan*, 144 F.4th 926, 936 (7th Cir. 2025), however, that *Carlson* "also dealt with management of chronic, non-emergent medical condition requiring continuous, periodic treatment over many months, as well as the administrative decisions that such treatment necessarily entails." Thus, *Carlson* was not *only* about the failure to provide medical care in the face of an emergency, but also, like Mr. Brown's claims, a failure to provide proper medical care for a chronic, non-emergent condition. The Seventh Circuit has

---

[1] Defendants Dr. Lukens and Dr. Wilson both argue that the lack of racial animus or malice differentiates Mr. Brown's case from *Carlson*. Although true the petitioner's complaint in *Carlson* alleged the deliberate indifference was due to racial animus, *Carlson*, 466 U.S. at n.1, the Court neither rested its opinion on this fact, nor even mentioned it in the opinion. *See generally*, *id.* Rather, *Carlson* extended the § 1983 cause of action against federal officers for medical indifference amounting to cruel and unusual punishment recognized in *Estelle v. Gamble*, 429 U.S. 97 (1976). The standard "deliberate indifference," requires no showing of animus or malice. *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553 (7th Cir. 2003).

[2] This distinction is unavailing because of the district court in *Carlson* noted, and the Supreme Court included in its opinion, "the decedent could have maintained this action if he had survived." *Carlson*, 446 U.S. at 17. Further, numerous cases brought by individual plaintiffs have not been found to be a new context. *See Brooks*, 131 F.4th 613; *Watkins*, 144 F.4th 926.

also recently stated that the factual distinctions concerning "duration of the poor care or the gravity of the condition . . . seem more pertinent to the merits than to determining the scope of *Carlson*." *Brooks*, 131 F.4th 613.

At its core, the allegations in this case are that Dr. Wilson and Dr. Lukens were deliberately indifferent to Mr. Brown's serious medical condition. Dkt. 254 at 2-3. The Seventh Circuit reiterated recently, "that *Carlson* makes relief available for claims that 'a federal prison's staff provided constitutionally deficient medical care.'" *Watkins*, 144 F.4th at 934 (quoting *Brooks*, 131 F.4th at 614). Although the facts here related to the medical care are not identical to those in *Carlson*, those differences are "more pertinent to the merits than to determining the scope of *Carlson*," *Brooks*, 131 F.4th 613, and therefore do not present a new *Bivens* context.

Dr. Wilson also argues that his supervisory capacity over Mr. Brown's care takes him outside the scope of liability for a *Bivens* claim. Dkt. 245 at 13. In *Brooks*, the Seventh Circuit distinguished between the defendants who directly treated the plaintiffs and the supervisor defendants who did not directly treat inmates but merely supervised BOP staff. *Brooks*, 131 F.4th at 616. For individuals in the latter group, the Court determined that holding them liable was "just vicarious liability by another name," which would warrant a new context to which *Bivens* should not be extended. *Id.* Accordingly, those two defendants, a warden and health services administrator, were dismissed. *Id.* So, the question here is whether Dr. Wilson's role with respect to Mr. Brown's care was merely supervisory.

17

Although Dr. Wilson argues that he only supervised Mr. Brown's atrial fibrillation treatment, the facts show otherwise.  Dkt. 263.  Unlike the health-services administrator and warden in *Brooks,* Dr. Wilson directly collaborated with Mr. Brown's cardiologist and determined what recommendations to follow, moved Mr. Brown's appointments when he deemed the need was urgent, and reviewed and co-signed multiple cardiac appointments and care decisions. Dkts. 244-4 at 1, 244-5 at 1, 253-4 at 4, 253-5 at 4.  Therefore, allowing Mr. Brown's claim against Dr. Wilson to proceed does not involve a new *Bivens* context.

The claims against Dr. Lukens and Dr. Wilson may proceed under *Bivens.*

### B.  Admissibility of Dr. Howard's Opinions

Defendants seek to exclude the following opinions offered by Mr. Brown's expert witness, Dr. Howard:

- Dkt. 254, page 2, lines 3 – 12, beginning with "Then, in 2019, Mr. Brown suffered a transient ischemic attack" and ending with "a decision that would ultimately cost Mr. Brown his vision."

- Dkt. 254, page 4, lines 14 – 16 "Throughout 2018 and 2019, Mr. Brown received consultations and underwent testing for atrial fibrillation; in the meantime, a planned follow-up ablation surgery was pushed farther into the future."  (citing dkt. 253-1 at 8 (Howard Rep. at 7).)

18

- Dkt. 254, page 5, lines 9 – 13 "to any reasonable observer, the February 2019 TIA was a clear warning complete with 'bells, whistles, and sirens' that Mr. Brown's care demanded extraordinary coordination between specialists and, crucially, consistent anticoagulant therapy."  (citing dkt. 253-10 at 34–35 (Howard Dep. at 31:24-32:11).)

- Dkt. 254, page 7, Paragraph 2 beginning with "in fact, other practitioners view Dr. Wilson's actions as falling far short of the standard of care" through page 8, line 8, ending with "the sole contributing factor to the vision loss, rather than the TIA."

Dkt. 256 at 3 (Defendants' motion to strike).[3]

Defendants argue that Dr. Howard's opinions are unreliable because (1) Dr. Howard cannot provide legal conclusions or opinions on causation; (2) Dr. Howard is not qualified in cardiology, pulmonology, or neurology, and he therefore cannot testify as to these specialists' determinations for Mr. Brown's care; and (3) Dr. Howard provides no reliable scientific methodology for his opinions.  *Id.*

In response, Mr. Brown argues that Dr. Howard appropriately established his findings within his report to make determinations of causation, he need not be a specialist to give his opinion on the overall supervision of Mr. Brown's care, and that his medical experience is sufficient for scientific methodology.  Dkt. 261.

---

[3] Defendants filed a separate motion to exclude Dr. Howard's opinions at trial, dkt. 248, which the Court denies as moot.

To testify as an expert, a witness must be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). A witness is qualified to be give an expert opinion "if the proponent demonstrates to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of principles and methods to the facts of the case."

Fed. R. Evid. 702.

In short, proponents of expert evidence "must demonstrate by a preponderance of evidence that their [experts'] opinions are reliable." Fed. R. Evid. 702 advisory committee's notes to 2023 amend. The district court acts as a "'gatekeeper' in determining the relevance and reliability of the opinion testimony and enjoys 'broad latitude' in making such a determination." *United States v. Moshiri*, 858 F.3d 1077, 1083 (7th Cir. 2017) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). These requirements are evaluated under the two-step *Daubert* framework. *Robinson v. Davol Inc.*, 913 F.3d 690, 692 (7th Cir. 2019) (citing *Daubert*, 509 U.S. at 693-94). For the first step, the proponent must "establish that the proposed witness would testify to valid scientific, technical, or other specialized knowledge." *Id.* If step one is satisfied, the proponent "must then show that the expert testimony will assist

the trier of fact." *Id.* For this step, the Court "evaluates whether the proposed . . . testimony fits the issue to which the expert is testifying." *Id.*

Here, Dr. Howard is a trained ophthalmologist and served as a Medical Director for the BOP, the same role Dr. Wilson held when supervising the care of inmates with complex medical conditions like Mr. Brown. Dkt. 251-1 at 2. He need not be a specialist in cardiology or neurology to review the care Mr. Brown holistically received just as Dr. Wilson would have done. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (emphasizing that what matters is not the title or specialty, but whether the expert "has the adequate education, skill, and training."). *United States ex rel. Calderon v. Carrington Mort. Servs.*, 70 F.4th 968, 974 (7th Cir. 2023) ("Rule 702 does not suggest that specialized knowledge can be developed only in certain ways. . . . [E]xperts and expertise come in many different forms."). The Court finds that Dr. Howard is sufficiently qualified to give opinions regarding Mr. Brown's holistic care under Dr. Wilson as a Clinical Director and ophthalmological care involving Dr. Lukens.

Next, "the court must determine whether the expert's testimony reflects scientific knowledge; that is, the court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citing *Daubert*, 509 U.S. at 592-93). "*Daubert* provides several guideposts for determining reliability. These guideposts examine (1) whether the scientific theory has been or can be tested; (2) whether the theory has been subjected to

21

peer-review and/or academic publication; (3) whether the theory has a known

rate of error; and (4) whether the theory is generally accepted in the relevant

scientific community." *C.W.*, 807 F.3d at 835.

"Ultimately, there are many different kinds of experts, and many different

kinds of expertise. The test of reliability, therefore, is flexible, and *Daubert*'s

list of specific factors neither necessarily nor exclusively applies to all experts

or in every case." *Gopalratnam*, 877 F.3d at 780. Anyone with relevant

expertise enabling him to offer responsible opinion testimony helpful to judge

or jury may qualify as an expert witness. Fed. R. Evid. 702; advisory

committee's notes to 1972 amend.; *United States v. Navarro*, 90 F.3d 1245,

1261 (7th Cir. 1996). "The principle of *Daubert* is merely that if an expert

witness is to offer an opinion based on science, it must be real science, not

junk science." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585,

591 (7th Cir. 2000).

Dr. Howard's medical opinions are not based on 'junk science,' but more

than twenty years of medical experience. Dkt. 251-1 at 2. Although the

defendants contend that Dr. Howard does not have a firm foundation for

basing his opinions regarding the appropriate standard of care, the Seventh

Circuit has found that a doctor can rely on medical history, including a review

of medical records. *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th

Cir. 2000). That is sufficient here. Mr. Brown has therefore established by a

preponderance of evidence that Dr. Howard meets the prerequisites of

admissibility to for a reliable opinion on the standards of care within his report and testimony.

And due to his specific knowledge of the circumstances and experience in the field, Dr. Howard's testimony and report will assist the Court in understanding the evidence and determining the facts at issue in this case. Accordingly, the defendants' partial motion to strike expert testimony on summary judgment, dkt. 256, is **DENIED**. Dr. Howard's testimony and evidence are considered for the purposes of the defendants' summary judgment motions. The defendants' partial motion to exclude expert testimony, dkt. 248, is discussed at the conclusion of this order.

### C.        Eighth Amendment Deliberate Indifference

The Eighth Amendment imposes duties on prison officials to "provide humane conditions of confinement . . . ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). Prison officials violate this duty "when they act with deliberate indifference to the serious medical needs of prisoners." *Cesal v. Moats*, 851 F.3d 714, 720-21 (7th Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). The liability attaches only when two requirements are met: (1) "the deprivation alleged must be, objectively, sufficiently serious," and (2) the official has a state of mind of

"deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 835 (internal citations omitted).

The Court assumes for purposes of the summary judgment motions that Mr. Brown's medical conditions were objectively serious. To avoid summary judgment, then, Mr. Brown must designate evidence from which a reasonable jury could conclude that Dr. Wilson and Dr. Lukens acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Brown's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). In the context of a deliberate indifference claim, the Court "must examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious needs." *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999) (internal citations omitted).

Mr. Brown "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has found deliberate indifference when a medical defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

This list is not exhaustive but only summarizes some of the most common scenarios in which a medical professional may be deliberately indifferent to the serious medical needs of a prisoner.

### 1. Dr. Wilson

Mr. Brown argues that two central decisions Dr. Wilson made were deliberately indifferent: 1) his failure to immediately order emergency care after reading Dr. Auxier's note from the February 15, 2019, visit; and 2) his delay in scheduling a second atrial fibrillation procedure. Dkt. 254 at 16-17. Dr. Wilson argues he was not deliberately indifferent to Mr. Brown's condition because Mr. Wilson was seen by several other doctors during the time, who did not deem his condition or need for a second ablation surgery as an emergency. Dkt. 258 at 11.

Mr. Brown designates as evidence the clinical encounter notes that Dr. Wilson co-signed from Mr. Brown's optometry appointment with Dr. Auxier in February 2019. Dkt. 253-8. At the appointment, Dr. Auxier examined Mr. Brown, who complained of episodes of foggy vision in December 2018 and

February 2019.  *Id.* at 3.  Following the visit, Dr. Auxier noted "probable transient ischemic attac[k]/ocular migraine; if it repeats PCP should rule out stoke/ diabetes."  *Id.*  This clinical note also states that Mr. Brown's medical history includes a prior stroke.  *Id.*  Mr. Brown argues that Dr. Wilson's failure to order immediate emergency care and follow-up examinations was deliberate indifference because he knew of Mr. Brown's medical history and atrial fibrillation.

A general practitioner may be deliberately indifferent to substantial risk of harm for failing to take instructions from a specialist, *Arnett v.* Webster, 658 F.3d 742, 753 (7th Cir. 2011), or for merely referring to another practitioner's opinion without review.  *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994). However, the designated evidence does not show that Dr. Wilson did either. The diagnosis notes, written by Dr. Auxier with full knowledge of Mr. Brown's previous stroke, state "if it [TIA] repeats PCP should rule out stroke."  Dkt. 253-8 at 3.  So, Dr. Wilson was not the only medical professional with knowledge that Mr. Brown's medical history included a stroke who did not decide that immediate follow-up urgent care or examinations by specialists were needed.

Additionally, Mr. Brown was seen by multiple other practitioners shortly after the February 15, 2019, visit with Dr. Auxier, none of whom indicated the presence of an emergency condition or urgent need for further examinations.  Dkt. 258 at 12.  On February 26th, for example, Mr. Brown saw Nurse Practitioner Klink who reported that "optometry diagnosed him with transient ischemic attacks/ocular migraine . . . PT complains of blurry vision

that is starting to improve[] . . . denies any headaches or any other neurological symptoms, and "schedule an ophthalmology for decreased and blurry vision . . . states doing a bit better . . . neurological exam completely normal." Dkt. 253-11 at 2; 4.

Mr. Brown also saw Dr. Koul, a cardiologist, on April 1, 2019, who notes the recent transient ischemic attack, "most recently he did have an episode with significant left visual field deficit with corresponding ischemia seen in occipital lobe on MRI. He is referred her[e] for further consideration of repeat catheter ablation." Dkt. 244-11 at 1.

These visits show that multiple medical personnel on Mr. Brown's care team knew of his recent transient ischemic attack and medical history, but do not show that Mr. Brown experienced similar episodes or that any of the providers deemed ruling out a stroke an emergency. Considering that other medical professionals who saw Mr. Brown shortly after February 15, 2019, did not order emergency or urgent follow-up care, dkt. 258 at 12, Dr. Wilson's failure to order such immediate care was not a decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729.

Although Dr. Howard opined that Dr. Auxier's note should have sent off "bells, whistles and sirens . . . in any physician's head . . . if he has more of these, needs to go out and be seen", dkt. 253-10 at 34 (Dr. Howard Dep. at 32), "evidence that *some* medical professionals would have chosen a different course

27

of treatment is insufficient to make out a constitutional claim." *Petties*, 836 F.3d at 729.

Perhaps a jury could find from the designated evidence that Dr. Wilson's failure to immediately order further care and inquiry regarding the possible transient ischemic attack February 15, 2019, was negligent. But even if so, "[o]rdinary medical malpractice, . . . malpractice that consists of negligent treatment—is not cruel and unusual punishment." *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994).

Turning to the delays in the scheduling of Mr. Brown's second atrial fibrillation procedure, a delay or denial of necessary treatment to an incarcerated individual suffering from avoidable pain can violate the Eighth Amendment's prohibition against cruel and unusual punishment. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647 (7th Cir. 2021); *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (reversing summary judgment for prison Doctor who had "rejected the obvious alternative to referring [the prisoner] to a dentist"); *Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008) (reversing summary judgment for plaintiff when prison physician refused to authorize a visit to urologist in light of prisoner's symptoms, increasing pain, and prior physician speaking to a urologist). However, the doctor must act with deliberate indifference to scheduling a specialist appointment in light of a known substantial risk of harm. *Farmer*, 511 U.S. at 837.

Here, the undisputed evidence shows that the delays in providing Mr. Brown with a second atrial fibrillation procedure were due to decision-making

28

related to Mr. Brown's complex medical conditions, not deliberate indifference. Mr. Brown was receiving care from at least seven doctors, numerous nurses, and was receiving constant treatment for both his heart and eye conditions. Dr. Wilson's pursuit of ophthalmological care was in response to Mr. Brown's real need for cataract surgery—one that he himself requested. Dkt. 242-2 at 1.

Also, the designated evidence shows that while receiving care for his failing vision, Mr. Brown was still also receiving care to proceed with a second ablation. Mr. Brown was scheduled to have the second procedure as early as July 2019, but because of his second stroke, it was delayed to February 2020. Dkt. 244-1 at 8. As early as December of 2018, Dr. Wilson even attempted to move Mr. Brown's appointments to earlier dates to provide him prompt and efficient care. Dkt. 244-4 at 1. The delays in performing the second procedure were reasonable under the circumstances.

Lastly, Dr. Wilson's decisions that Mr. Brown argues were deliberately indifferent must be evaluated in the context of the entirety of his course of care for Mr. Brown. *Reed v. McBride*, 178 F.3d at 855. The record shows that under Dr. Wilson's care and direction, Mr. Brown had a team of medical professionals managing his complex medical conditions. Dkt. 258 at 5-8; 12 (listing the numerous medical provider visits (ten appointments), tests, medication adjustment, and Holter monitor placement that Dr. Wilson facilitated for Mr. Brown from December 2018 to June 2019). This evidence, which reflects that Dr. Wilson and his cardiologists worked collaboratively to

proactively investigate and remedy Mr. Brown's heart conditions using their medical judgment, cuts against an inference that Dr. Wilson was deliberately indifferent.

Mr. Brown is not entitled to any specific course of treatment and cannot prevail on a deliberate indifference claim based on disagreement with Dr. Wilson's medical judgment. *See Arnett*, 658 F.3d at 754 ("[A]n inmate is not entitled to demand specific care"); *see also Cesal*, 851 F.3d at 722 ("[M]ere disagreement with a [provider's] medical judgment is not enough to support an Eighth Amendment violation."). Accordingly, no reasonable jury could conclude that Dr. Wilson was deliberately indifferent, and he is entitled to summary judgment.

### 2. Dr. Lukens

Mr. Brown argues that Dr. Lukens was deliberately indifferent when he approved Dr. Patel's order to withhold anti-coagulants before Mr. Brown's cataract surgery because of his knowledge of Mr. Brown's atrial fibrillation and medical history. Dkt. 257 at 11. Dr. Lukens argues that his co-signing of the pre-operation order was reliant on the knowledge of the ophthalmologist, and that he "did not believe under the circumstances that the order to stop the Plaintiff's blood thinners prior to surgery was excessive or that [he] had a basis to reject or override the decision." Dkt. 257 at 13; Dkt. 242-2, Lukens Decl. ¶ 8).

Because Dr. Lukens states that he used his medical judgment in co-signing the pre-operative order, he is effectively stating that he did not have the

culpable mindset to be deliberately indifferent.  Dkt. 242-2, Lukens Decl. ¶ 8; *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) ("A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.").  The Seventh Circuit has emphasized the importance of deferring to the professional judgment of medical personnel.  *Brown v. LaVoie*, 90 F.4th 1206, 1212 (7th Cir. 2024).  However, a doctor does not automatically escape liability by claiming they used professional judgment.  *Zaya*, 836 F.3d at 805.  Mr. Brown can overcome summary judgment by offering evidence that Dr. Lukens did not honestly believe he was following professional standards, by showing the defendant's "course of treatment departs radically from accepted professional practices," *id.*, or that "no minimally competent professional would have so responded under those circumstances."  *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008).

The experts retained by both parties disagree over what the standard of care is for the appropriate timeframe for withholding anti-coagulants before cataract surgery.  Dkt. 244-21 at 6 (Dr. Lefkowitz Rep.) ("The standard of care in 2019 . . . was typically 3 days."); dkt. 253-12 at 69 (Dr. Sutton Dep.) ("My understanding is that most cataract surgeons do not routinely withhold blood thinners prior to cataract surgery. Some still do . . . I think if you go back further in time, it would have been more common for them to be withheld."); dkt. 253-10 at 55-56 (Dr. Howard Dep.) ("The typical—I don't want to say standard, because it varies by, again, where they were trained, how they were

trained, and what they have found works for them[.]").  Given this lack of

consensus among multiple doctors regarding whether it was appropriate to

withhold Mr. Brown's anticoagulant medical for the cataract surgery and if so

for how long, no jury could reasonably find that Dr. Lukens's decision to

approve the five-day stoppage departed so substantially "'from accepted

professional judgment, practice, or standards as to demonstrate that'" it is not

based on judgment at all. *Petties*, 836 F.3d at 729.

But even if Dr. Patel's hold of anti-coagulants for five days exceeded the

general standard of care for such procedures, this does not mean that Dr.

Lukens' failure to override his order would amount to deliberate indifference.

As an initial matter, Dr. Lukens was relying on Dr. Patel as a surgeon to

determine the appropriate timeframe to stop blood thinners. *Arnett*, 658 F.3d at

753 (stating that deliberate indifference may be found where prison physician

acts in a manner contrary to the recommendation of specialists).  At most, the

decision to stop Mr. Brown's blood thinners five days before surgery was

negligent.  "A negligent exercise of medical judgment is not enough to show

deliberate indifference. [A] plaintiff must show a failure to exercise medical

judgment at all." *Howell*, 987 F.3d at 660.

Finally, Dr. Lukens' co-signing of Dr. Patel's order to hold the anti-

coagulants must be evaluated considering the totality of care Mr. Brown

received from Dr. Lukens.  *Reed*, 178 F.3d at 855.  The record reflects that Dr.

Lukens co-signed the order as part of Mr. Brown's ongoing care for his

cataracts.  Dkt. 257 at 6-7, 8 (detailing Dr. Lukens' role as Mr. Brown's

primary doctor during Mr. Brown's cataract treatment in which Mr. Brown had three appointments with optometry and ophthalmology specialists, surgery, and two post-surgery appointments with Dr. Lukens, one being when Dr. Lukens ordered for Mr. Brown to be sent to the emergency room).  Balancing Dr. Lukens' co-signing of the pre-operative instructions with Mr. Brown's extensive medical treatment for his eyes during the time, at most, Dr. Lukens' actions were, "simply isolated instances of neglect, which taken alone . . . cannot support a finding of deliberate indifference."  *Reed*, 178 F.3d at 855 (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997)).

Here, the designated evidence shows that both Dr. Wilson and Dr. Lukens exercised their professional judgment when making treatment decisions for Mr. Brown, and based on the evidence in the record, no reasonable juror could find that their treatment of Mr. Brown "was not the product of medical judgment."  *Cesal*, 851 F.3d at 724; *see also Zaya*, 836 F.3d at 805 ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").  Accordingly, Dr. Wilson and Dr. Lukens' motions for summary judgment, dkts. [242], [244], are **GRANTED**.[4]

---

[4] Because the Court concludes that the defendants' did not violate the Eighth Amendment, it need not address their alternative argument that they are entitled to qualified immunity.

## IV.
## Conclusion

Dr. Trueblood's motion for summary judgment, dkt. [240], is **DENIED AS MOOT.**  The Defendants' partial motion to strike expert testimony on summary judgment, dkt. [256], is **DENIED.**

Dr. Wilson and Dr. Lukens' motions for summary judgment, dkts. [242], [244], are **GRANTED**.  Final judgment will issue in a separate entry.

The defendants' partial motion to exclude expert testimony, dkt. [248], is **DENIED AS MOOT**.

Last, the Court expresses its gratitude to Ms. French and Ms. Froehle for representing Mr. Brown on a *pro bono* basis.

**SO ORDERED.**

Date: 9/24/2025

James Patrick Hanlon
United States District Judge
Southern District of Indiana


Distribution:

RAYMOND DEAN BROWN
06770-091
TERRE HAUTE - FCI
TERRE HAUTE FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 33
TERRE HAUTE, IN 47808

All Electronically Registered Counsel